**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DAVID FALGOUT** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-07** |
| **DARREL VANNOY, WARDEN** | **SECTION: "J"(5)** |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, David Falgout, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. In January 2014, Falgout was charged with two counts of aggravated rape of the victim, K.W., and one count of armed robbery of the same victim.[1] On October 22, 2014, a jury found him guilty of two counts of attempted forcible rape and not guilty of armed robbery.[2] On April 16, 2015, his motions for post-verdict judgment of acquittal and for a new trial were denied, and he was sentenced to serve

---

[1] State Rec., Vol. 1 of 6, Grand Jury Indictment, Orleans Parish.

[2] State Rec., Vol. 1 of 6, Trial Minute Entry, 10/22/2014.

20 years at hard labor without benefit of probation, parole or suspension of sentence on each count.[3]    The State filed a multiple bill of information alleging that Falgout was a third-felony offender.[4]    After a multiple-offender bill hearing, the trial court vacated the original sentence and sentenced Falgout as a multiple offender to life imprisonment without benefit of probation, parole or suspension of sentence on each count.[5]    His motion to reconsider the sentence was denied.

On direct appeal, he raised two counseled assignments of error: (1) there was insufficient evidence to support the convictions and (2) the trial court erred in allowing the State to introduce evidence of his prior forcible rape conviction.    Falgout also raised one *pro se* assignment of error alleging that (3) trial counsel was ineffective for failing to file a written objection to the multiple-offender bill.    On August 24, 2016, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[6]    On June 16, 2017, the Louisiana Supreme Court denied his application for writ of certiorari.[7]

In March 2018, Falgout submitted his application for post-conviction relief to the state district court.[8]    In that application, he raised several claims of ineffective assistance

---

[3]  State Rec., Vol. 1 of 6, Sentencing Minute Entry, 4/16/2015; State Rec., Supp. Vol. 1 of 3, Sentencing Transcript, p. 6.

[4]  State Rec., Vol. 1 of 6, Multiple Offender Bill of Information.

[5]  State Rec., Vol. 1 of 6, Sentencing Minute Entry, 4/16/2015; State Rec., Supp. Vol. 1 of 3, Sentencing Transcript, pp. 26-27.

[6]  *State v. Falgout*, 2015-KA-0953 (La. App. 4 Cir. 8/24/16), 198 So.3d 1232; State Rec., Vol. 4 of 6 (the State notes that the record does not include a copy of the *pro se* appellant brief, but the assignment is set out in the direct appeal opinion). Rec. Doc. 20, p. 3 n. 13.

[7]  *State v. Falgout*, 2016-KO-1831 (La. 2017), 220 So.3d 756; State Rec., Vol. 6 of 6.

[8]  State Rec., Vol. 1 of 6, Uniform Application for Post-Conviction Relief and

of counsel: (1) trial counsel was ineffective for failing to consult with an expert in DNA analysis who would have disputed the findings of the prosecution's expert witness; (2) trial counsel was ineffective for failing to conduct adequate investigation to present a proper defense; (3) appellate counsel was ineffective for failing to assert claims on direct appeal; and (4) the admission of other crimes evidence violated his right to a fair trial and due process.     On April 11, 2018, the state district court denied his application for post-conviction relief.[9]     The first three claims of ineffective assistance of counsel were denied on the merits.     The district court declined to consider the remaining claim, considering that "the issue was raised and fully litigated on direct appeal," pursuant to Louisiana Code of Criminal Procedure article 930.4(A).     On June 28, 2018, the Louisiana Fourth Circuit denied Falgout's supervisory writ application finding no error in the lower court's "rejection of the conclusory and/or repetitive claims" or in the denial of the relator's application for post-conviction relief.[10]     On October 8, 2019, the Louisiana Supreme Court denied relief, finding that he failed to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984), and that the remaining claim was repetitive under Louisiana Code of Criminal Procedure article 930.4.[11]

---

Memorandum in Support.     The application does not include the day in March of 2018 on which he signed the application.     However, the State does not allege that the instant federal application is untimely and simply accepts that he filed the application in March 2018.

[9]  State Rec., Vol. 1 of 6, State District Court Judgment and Reasons for Judgment, 4/11/2018.

[10]  State Rec., Vol. 5 of 6, *State v. Falgout*, 2018-K-0528 (La. App. 4 Cir. June 28, 2018).

[11]  *State v. Falgout*, 2018-KH-1343 (La. 10/8/2019), 280 So.3d 146; State Rec., Vol. 6 of 6.

On or about December 16, 2019, Falgout filed the instant federal application for habeas corpus relief.[12]    In that application, he raises five claims for federal relief:    (1) the State's evidence was insufficient to convict him; (2) the trial court erred in allowing the State to introduce evidence of his prior forcible rape conviction; (3) he was denied the effective assistance of trial counsel, who failed to file an objection to the multiple bill, failed to consult an expert in DNA analysis, and conducted inadequate investigation to present a viable defense; (4) the trial court erred in allowing the admission of "other crimes" evidence; and (5) appellate counsel was ineffective in failing to raise claims on direct appeal.    The State concedes that the federal petition is timely and that the claims have been exhausted in the state courts.[13]    Falgout filed a memorandum in opposition to the State's response.[14] Pursuant to this Court's order, the state-court record was supplemented to include all pertinent hearing and trial transcripts.[15]

## Facts

On direct appeal, the Louisiana Fourth Circuit summarized the facts adduced at trial:

The jury convicted the defendant of two counts of attempted forcible rape that occurred on September 2, 2013. The defendant had previously been convicted of a 1988 rape, and the State presented evidence of this rape at his trial on the present charges. With respect to the earlier rape, the State played the authenticated 911 call in connection with that rape, and then the State called former Officer William Remaudin, who investigated the rape. Remaudin stated that on June 10, 1988, he responded to a call of a rape that was in progress in the 1300 block of Esplanade Avenue. He arrived at the location, and as he walked down the block, he saw the defendant raping the victim across the

---

[12]  Rec. Doc. 1, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

[13]  Rec. Doc. 20.

[14]  Rec. Doc. 25.

[15]  Rec. Docs. 26, 30. *See* Supplemental State Court Record Volumes 1-3.

street from where the officer was standing. When the defendant saw the officer, he jumped up, pulled up his pants, and ran toward N. Claiborne Avenue. The defendant was captured by the officer in the same block, and the victim identified him. The officer informed the jury that he testified at defendant's subsequent trial, at which the jury convicted the defendant of rape.

V.H. testified that she was the victim of the June 10, 1988 rape. She had been waiting for the Esplanade bus, but when it did not come, she began walking down Esplanade Avenue at approximately 10:00 pm. She stated that she saw someone walk across the street, and then the defendant grabbed her, put a knife to her neck, and pushed her into a setback area of a building. He demanded her money and then demanded sex. She stated that she struggled with him until he touched her with the knife, and then she submitted. He made her lie on the ground, removed her pantyhose, and raped her. She testified that when a police car arrived, the defendant got up, said he had to go, and then ran. She stated that the police captured the defendant, and she identified him at the scene. V.H. testified that the defendant kept putting the knife to her chest during the rape. She stated that she testified at defendant's trial, at which he was convicted of rape.

With respect to the present charges, the State authenticated and played the 911 call that was made by K.W.'s uncle on the morning of September 2, 2013. In the call, the uncle explained that K.W. was on her way to work when a man tried to rape her. K.W. then got on the phone and told the 911 operator that she was waiting for a bus at a stop that was located next to a construction area when a man came up to her and began speaking with her. He then got up, put a knife to her leg, and forced her go under a "bridge," where he took her bus fare and raped her. She stated that the rape occurred at Broad and New Orleans Streets.

### *K.W.'s testimony*

K.W. testified that on the morning of September 2, 2013, she walked to the bus stop, while it was still dark, to catch the bus for her 7:00 a.m. shift. While waiting for the bus, K.W. was texting her friend when she saw a shadow walk past her. She stood up, and a man standing near her apologized for scaring her. She had never seen the man before that day. She stated that they made small talk, and he told her that he did construction work. She then looked back down at her phone, and he came up behind her, grabbed her around the neck, and placed a pocket knife to her neck. He told her not to make a sound and to follow him.

K.W. testified that the man took her under the bridge (overpass) at New Orleans and Benefit Streets. She stated that he pulled down her pants, put his finger in her vagina and anus, and touched her genital area. He then made her get on her knees, and he unsuccessfully tried to penetrate her with his penis

several times. She testified that he then ordered her to lie down on a piece of wood that was lying on the ground, and he fondled her breasts and put his mouth on her buttocks. He told her that he would not stab her if she did not panic. She stated that he also made her lick his penis before he left her. K.W. testified that he instructed her to stay on the scene until he left. Once the man left, she went to a nearby halfway house, where she believed she would find a policeman, and she asked the people there if they had seen a man dressed in the same manner as the man who had assaulted her. They had not seen anyone meeting that description, and she then returned home, where her family called the police.

K.W. described the area of the assault as a construction area, but no construction activity was occurring at the time of the assault, and no workers were present because it was Labor Day. She stated that the man took her behind a fence under the overpass. She stated that the phone that he took from her was never recovered. She admitted that the man was never able to penetrate her with his penis. She stated that she met with the police on the day of the assault, took them to the area where the rape occurred, and then went to the hospital to be examined. She reiterated that the man threatened to stab her if she panicked.

During cross-examination, K.W. testified that she arrived at the bus stop at around 5:30 a.m., which was earlier than she normally arrived. She stated that she told Det. Henry that the perpetrator sweated a lot during the assault, and this led her to believe that he was under the influence of drugs. She stated that she believed he may have needed money to get drugs because he took her $2.50 bus fare. She explained that she had dated someone who used drugs, although she did not use them. She admitted that she told the SANE nurse that she used marijuana, but she explained that she did not use "heavy" drugs. She denied that she smoked marijuana on the morning of the assault. When defense counsel played the tape of her statement, she admitted that she told Det. Henry that she knew the perpetrator was out looking for drugs, and the police could probably find him on Broad Street. She denied that the perpetrator told her he had money and asked her for a "sexual favor" for which he would pay. She admitted that her phone service was cut off a few days later because she had not paid the bill, but she denied that she performed any sexual acts for money. She stated that she told Det. Henry that they should swab her left palm because she had used it to grab the perpetrator's penis, and she had not washed her hand. She insisted that she did not take a shower upon the advice of her mother.

K.W. testified that it did not appear that anyone was living in the space under the overpass where the rape occurred, nor did it appear that anyone had used the wooden board as a place to sleep. She did not recall seeing a sleeping bag under the overpass, and she saw no panhandlers out there that morning. She admitted that she sustained no physical injuries, and while she refused HIV

medication, she received other preventive vaccines/medication. With respect to her inability to create a composite sketch of the perpetrator, K.W. admitted that she was unable to "put the face together" with the different features in the kit, but she told the police that she would be able to identify the perpetrator if she saw him face to face. She stated that Det. Henry never showed her a photograph from which she could make an identification.

On redirect, K.W. testified that she did not remember if the perpetrator asked her for drugs. She testified that despite the fact that she could not complete a composite, she gave a physical description of the perpetrator, including his height, weight, complexion, and his clothing. She insisted that the perpetrator tried to penetrate her. She denied that the sexual encounter was for money or was consensual, and she insisted that she did not just give him her $2.50 bus fare.

### *Detective Reuben Henry's Testimony*

Detective Reuben Henry responded to the 911 call and met K.W. at her residence, which was approximately four blocks from the scene of the rape. He described the victim as nervous and shaking, and he conducted a recorded interview with her. He stated that K.W. was still wearing her uniform shirt at that time. He stated that he drove K.W. to the scene of the rape, and he identified photographs of the scene that were taken five or six weeks after the rape. Det. Henry described the scene as a construction area under an elevated portion of I–610. He stated that the rape occurred behind a construction storage container that was subsequently removed from the site. He testified that he canvassed the area for the victim's cellphone and money that she indicated that the rapist took, but he found nothing. Det. Henry stated that he checked with the victim's cellphone carrier, but because she had not activated the phone's GPS, the carrier could not track it.

Det. Henry stated that he took the victim to the LSU Interim Hospital for a sexual assault exam, where the victim's clothing was seized, which he identified. He testified that swabs and a blood sample were taken from K.W. and submitted to the Louisiana State Police crime lab. He later received notification from the Combined DNA Index System (CODIS), a national database, indicating that the sample taken from the victim matched DNA previously taken from the defendant in connection with the 1988 rape. Det. Henry contacted K.W. to see if she knew him, to which she replied that she did not and had not consented to any sex with or touching by him.

Det. Henry learned that the defendant, who had a conviction for forcible rape, was not incarcerated at the time of the 2013 rape, having been released three months prior to that rape. Det. Henry obtained an arrest warrant for the defendant. Once he located the defendant, Det. Henry obtained a search warrant for a buccal swab from the defendant to get fresh DNA to compare

with swabs taken from K.W. He sent this swab to the State Police crime lab.

On cross-examination, Det. Henry testified that he did not know if there were homeless people in the area of the rape. He stated that K.W. gave him a height and weight estimate of the perpetrator, which he included in his police report, but he admitted that the estimated weight reflected in the narrative portion of the report was probably a typographical error. He admitted that he never had any physical contact with the defendant. Det. Henry stated that K.W. estimated the rapist's age as forty-one to forty-four, but the defendant was fifty-one at the time of trial. Det. Henry did not remember if he asked K.W. if she was under the influence of anything that would have affected her ability to identify the perpetrator, and he stated that he did not ask K.W. if she had agreed to have sex for money. He admitted that while K.W. stated that she was forced to perform fellatio on the perpetrator, she told him that she did not know if the perpetrator was circumcised.

With respect to the scene of the rape, Det. Henry testified that while the photographs he identified were taken several weeks afterward, they accurately reflected the scene. He admitted that no photos were taken from the area behind the storage container where the rape occurred. He also admitted that he saw no drag marks from the bus stop to the scene of the rape. He was unable to find any witnesses to the rape. He also saw no visible injuries on K.W.

Det. Henry testified that he did not know which pieces of K.W.'s clothing were submitted for testing at the State Police crime lab. He stated that he learned that K.W.'s phone was sold right after the assault, but he was never able to recover the phone, nor did he recover the money taken in the incident or the knife that the perpetrator used. He stated that the day after the rape, K.W. met with a police artist in an attempt to make a composite sketch, but K.W. could not remember enough details of the offender's features to complete a composite. He stated K.W. never viewed a photograph of the defendant because she was still upset at the time he tried to do so, broke down, said she was not ready to see the man who assaulted her, and refused to look at the photo.

On re-direct, Det. Henry stated that once a person is arrested in New Orleans and taken to Central Lockup, that person's information is entered into a database, from which an arrest register is created. He testified that when the police report was written in the present case, the defendant had not yet been arrested. He stated that the defendant's weight given in that report was based on old information, possibly from his last arrest in 1988. Det. Henry identified the arrest register in the present case, which listed defendant's weight, height, and his address. Det. Henry stated that normally, he would not show a victim a photograph of a suspect if there was a DNA match.

### *Sexual Assault Examination*

The parties stipulated that Kimberly Darr, a SANE nurse, is an expert in sexual assault examination and care. Ms. Darr testified that she examined K.W. at University Hospital, and she identified her report from the exam. During her examination of K.W., K.W. admitted that she had used marijuana within the past ninety-six hours, and a test of her urine was positive for marijuana. Ms. Darr testified that she saw no physical injuries on K.W. during the exam. She took external genitalia swabs, but she did not perform an internal exam. She insisted, however, that the lack of physical injuries did not rule out rape. Ms. Darr took samples from under K.W.'s fingernails and buccal swabs, as well as swabs from her breasts and buttocks because K.W. indicated that the perpetrator touched or kissed her in those areas. Ms. Darr testified that while K.W. took some preventive vaccines, she opted out of an HIV regime, which Ms. Darr described as a twenty-eight-day, intensive regime with several side effects. In addition, K.W. indicated that there was no penile penetration.

On cross-examination, Ms. Darr testified that she met with K.W. on the morning of the rape, after K.W. had arrived at the emergency room. She stated that K.W. had no cuts, bruising, redness, swelling, or scrapes to her neck or any other place on her body, and she had no visible genital injuries. K.W. did not indicate that she was in pain, and Ms. Darr did not take any photographs of K.W. She also did not seize K.W.'s underwear or her pants because K.W. told her that the perpetrator had thrown them to the side, and he also had not penetrated her. She stated that K.W. refused an internal exam. Ms. Darr listed the places from which she took swabs: two from K.W.'s external genitalia; two buccal swabs; two each from each of her buttocks; two from each of her breasts; two from her left palm; two from her anal region; and two from her perineal area. On redirect, Ms. Darr explained that the lack of any cuts did not disprove that the perpetrator had a knife; the lack of tearing in the genital area did not disprove that a rape occurred; it was not uncommon to see no physical trauma in rape cases; and it was not uncommon for a rape victim to decline to have an internal exam.

### *Forensic DNA Analysis*

The parties stipulated that Elizabeth Hamilton is an expert in the field of forensic DNA analysis. She testified that she was employed in the Louisiana State Police crime lab, and she tested the swabs taken in this case. She identified her report from the initial test, Exhibit S–12, wherein she detailed the samples that were submitted for analysis. She testified that swabs taken from K.W.'s external genitalia (1B), her perineal area (1C), and her breasts (1F) were negative for acid phosphate (AP), which is found in seminal fluid, and they contained DNA that was consistent only with K.W.'s DNA profile. The sample from K.W.'s left palm (1G) was also AP negative, and the sample was consistent with DNA from two contributors. She stated that while K.W. could

not be excluded as the major contributor of the DNA, the remaining DNA in the sample was at such a low concentration, only one allele, that she could not develop a DNA profile of the minor contributor, as she would need at least seven alleles in the sample in order for her to determine a DNA profile of the minor contributor. Ms. Hamilton testified that she tested two hairs; in one (1I1) she did not detect the presence of amplifiable DNA, while in the other (1K1) there was insufficient DNA to produce a valid profile. The sample from K.W.'s right buttock was AP negative and was a mixture of DNA from two contributors; K.W. could not be excluded as the major contributor, but there was insufficient DNA to compile a minor contributor profile. The sample from K.W.'s bra was AP negative, and testing showed that it contained a DNA mixture from two people. K.W. could not be excluded as the major contributor, but the DNA from the minor contributor was in such low concentration that she could not develop a valid DNA profile.

Ms. Hamilton testified that the sample from K.W.'s left buttocks (1H) was also AP negative, but it contained sufficient DNA for her to compile major and minor DNA profiles. Testing showed that K.W. could not be excluded as the major contributor, but the minor contributor was unknown at that time. Ms. Hamilton extracted K.W.'s DNA from the sample and sent the remainder to CODIS. She stated that about a week later, CODIS indicated that it had found a match for this DNA, and she notified NOPD of the match. Ms. Hamilton later received two buccal swabs from the defendant, which she used to compare with the DNA profile that she found in the sample from K.W.'s left buttock (1H). She identified her report on this comparison (Exhibit S–13), from which she determined that K.W. could not be excluded as the major contributor, and the defendant could not be excluded as the minor contributor. She noted that sample 1H also contained an additional allele that was not consistent with either K.W. or the defendant, but this sole allele was not sufficient for her to develop a profile of a possible third contributor. Ms. Hamilton testified that she took the alleles from sample 1H, pulled those from each contributor, and "applied a statistic to each allele individually which is then all compiled into one statistic." From this comparison, Ms. Hamilton concluded that it was 411 billion times more likely that the sample contained DNA that was a mixture of DNA from K.W. and the defendant than from K.W. and an unrelated random individual from the Caucasian population. With respect to the African–American population, it was 195 trillion times more likely to be from K.W. and the defendant than from K.W. and an unrelated random individual; the likelihood with respect to the Southwest Hispanic population was 54.0 times more likely to be from K.W. and the defendant than from K.W. and an unrelated random individual.

During defense counsel's exhaustive cross-examination of Ms. Hamilton, she admitted that she did not know how the DNA consistent with defendant's DNA got on K.W.'s left buttock. She agreed that DNA can be transferred by direct touch and by an intermediary touching, where someone touches an object,

transfers DNA to it, and then another person touches the object, and the DNA transfers to the second person. Counsel extensively went over Ms. Hamilton's findings and the concentration of DNA material she observed in each sample. She agreed that she was able to develop a profile that was consistent with the defendant only from the sample on K.W.'s left buttock, as this was the only sample that contained all alleles from either K.W. or the defendant. She also agreed that samples 1H (left buttock) and 1G (left palm) contained an allele that was not present in either K.W.'s or defendant's profiles, and the sample from K.W.'s bra (1J1) did not contain an allele that was in the defendant's profile. In addition, she admitted that because the oral and anal swabs (1D and 1E) were both negative for sperm or semen, she did not further test them.

On redirect, Ms. Hamilton explained the difference between primary transfer (from one person to another) and secondary transfer (from a person to an object, and then from the object to another person), and she stated that there is a higher probability of transfer of DNA material if the transfer is primary. With respect to secondary transfer, environmental conditions such as heat, cold, and rain can destroy or degrade DNA, and she stated that for this reason, she is less likely to be able to develop a DNA profile from a secondary transfer. She stated that she did not always detect sperm or seminal fluid in sexual assault cases, and she opined that the fact that K.W. brushed her teeth prior to submitting her oral swabs would have an impact on the ability to detect DNA in her mouth.

### *Defense Witness*

The defense called only one witness, Elaido Valdez, who was a defense investigator. Mr. Valdez identified several photographs that he took of the scene of the sexual assault approximately four months after the assault. He stated that three of the photographs showed a sleeping bag and wooden platform in the area of the assault. On cross-examination, Mr. Valdez admitted that the sleeping bag was the only item in the area that possibly showed that a homeless person stayed in there. He testified that he did not collect any of the items shown in the photographs because his job was only to photograph the scene.

The defendant did not testify at trial.[16]

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective

---

[16] *State v. Falgout*, 198 So.3d at 1233-39.

Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court

"identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Id*. (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

### A. Sufficiency of the Evidence (Claim 1)

Falgout asserts that the evidence presented by the State was insufficient to convict him of attempted forcible rape.    The claim was considered and rejected by the state courts on direct appeal.    In denying the claim, the court of appeal reasoned:

> By the first assignment of error, counsel contends that there was insufficient evidence to support the verdicts. Counsel argues that the evidence did not prove beyond a reasonable doubt that the defendant was the perpetrator. Counsel also appears to argue that the evidence did not conclusively prove

that the victim was raped.[17]   We find no merit to these claims.

When reviewing a claim of insufficiency of evidence, the appropriate standard was set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): the court must determine whether the evidence, viewed in the light most favorable to the prosecution, "was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La. 1984); see also *State v. Brown*, 2003–0897, p. 18 (La. 4/12/05), 907 So.2d 1, 22; *State v. Veal*, 2012–0712, p. 17 (La. App. 4 Cir. 5/1/13), 116 So.3d 779, 790. If the State uses circumstantial evidence to prove the elements of the offense, "La. R.S. 15:438 requires that 'assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.' " *State v. Neal*, 2000–0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657; see also, supra, *Brown*; *Veal*. A reviewing court must give deference to the credibility determinations of the fact finder, and the court must not re-weigh the evidence. *State v. Jones*, 2010–0018, p. 6 (La. App. 4 Cir. 11/10/10), 51 So.3d 827, 831.

While the defendant was charged with two counts of aggravated rape, the jury convicted him of two counts of attempted forcible rape. Aggravated rape which was defined at the time of the crime in pertinent part by La. R.S. 14:42:[18]

> A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> * * *
>
> (3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

La. R.S. 14:41 defines rape:

> A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

---

[17]  Although originally charged with two counts of aggravated rape, defendant was found guilty of two counts of attempted forcible rape.

[18]  La. R.S. 14:42 and 14:42.1 were amended in 2015 to change the names of the offenses from "aggravated rape" and "forcible rape" to "first degree rape" and "second degree rape." The present offenses were committed prior to the amendments to the statutes.

B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.

C. For purposes of this Subpart, "oral sexual intercourse" means the intentional engaging in any of the following acts with another person:

(1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.

(2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.

Forcible rape was defined by La. R.S. 14:42.1:

A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

(2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.

An attempt is defined in pertinent part by La. R.S. 14:27:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

B.(1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

* * *

15

C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.

Lastly, as noted in *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 252 (La. 1982), "when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged." See also *State v. Graham*, 2014–1801 (La. 10/14/15), 180 So.3d 271; *State v. Pleasant*, 2010–1533, p. 56 (La. App. 4 Cir. 5/18/11), 66 So.3d 51.

While the defendant hints that the evidence did not show that the victim was raped, the evidence adduced at trial supports the jury's finding that two counts of attempted rape occurred. K.W. testified that the perpetrator attempted to rape her both vaginally and anally, but he was not able to penetrate her very much. In addition, she testified that he placed his finger in her anus and her vagina. With respect to a second count of rape, the victim testified that the perpetrator ordered her to perform fellatio on him; this action supported a finding that a second count of rape occurred. The rapes occurred while the perpetrator was armed with a knife, thus satisfying the element of aggravated rape, with which the defendant was charged.

The defendant's main claim with respect to sufficiency is tied to his assertion that the State failed to prove that he was the perpetrator of the sexual assault. As noted by this court in *State v. Stewart*, 2004–2219, p. 6 (La. App. 4 Cir. 6/29/05), 909 So.2d 636, 639, when a defendant disputes identity, "the State must negate any reasonable probability of misidentification in order to satisfy its burden under *Jackson v. Virginia*." (citations omitted). Normally, when disputing identity, a defendant seeks to cast doubt on a physical identification, requiring a reviewing court to employ the five-part test for determining the reliability of an identification set forth in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). However, here the victim never identified the defendant as the perpetrator; instead, he was identified through DNA analysis of swabs taken from the victim's body.

Det. Henry testified that after he received notification that the defendant's DNA matched that in K.W.'s samples, he attempted to show K.W. the defendant's photograph, but she refused to look at it because she was so upset. At trial, K.W. never identified the defendant as her assailant. In addition, she was unable to complete a composite of her attacker. The defendant points to all of these factors, as well as his claim that the description given by K.W. was vague and did not really match his, as support for his claim that the State failed to prove his identity as the perpetrator.

Nonetheless, Ms. Hamilton testified that DNA evidence from a swab taken from K.W.'s left buttock showed that K.W. could not be excluded as the major contributor of DNA and that the defendant could not be excluded as the minor contributor. Importantly, she concluded that it was 411 billion times more likely that the sample contained DNA that was a mixture of DNA from K.W. and the defendant than from K.W. and an unrelated random individual from the Caucasian population. With respect to the African–American population, it was 195 trillion times more likely to be from K.W. and the defendant than from K.W. and an unrelated random individual; the likelihood with respect to the Southwest Hispanic population was 54.0 trillion times more likely to be from K.W. and the defendant than from K.W. and an unrelated random individual.

The defendant points to the fact that Ms. Hamilton was unable to find his DNA on K.W.'s genitalia or anus, nor was there any seminal fluid in the swabs from those areas. He also points to the fact that there was only a small amount of DNA consistent with his on K.W.'s buttocks, and he theorizes that his DNA could have been transferred to her when the perpetrator made her lie down on the wooden board while he attempted to rape her. However, Ms. Hamilton testified that any DNA evidence left on a wooden board as theorized by the defense would be subject to degradation or destruction by the elements. The defendant also points out that this DNA sample was negative for seminal fluid. However, K.W. testified that in addition to trying to penetrate her, the perpetrator also kissed her buttocks. If his DNA was deposited in this fashion, there would not have been any seminal fluid. Finally, he points to K.W.'s failure to remember if the perpetrator was circumcised, even though she stated that she placed her left hand around his penis.

Nonetheless, none of these arguments disproves his identification as the perpetrator. The jurors were made aware of all of these arguments, and they still found that the State proved that the defendant was the perpetrator. A fact finder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. *State v. Meyers*, 2011-1145, p. 8 (La. App. 4 Cir. 9/19/12), 100 So.3d 938, 943–44 (internal citations omitted); *State v. Johnson*, 2009-0259, p. 9 (La. App. 4 Cir. 9/16/09), 22 So.3d 205, 211. The defendant has made no showing that the jury's finding is contrary to the evidence. Despite the lack of any identification by the victim, the State showed that it was between 411 billion to 195 trillion times more likely that the sample taken from K.W.'s buttock contained DNA from her and the defendant than from her and another unrelated random individual.

While K.W. did not identify the defendant, the DNA evidence adduced at trial was sufficient for the jury to reject the defendant's theory that his DNA was transferred to her when she lay down on the wooden board. Thus, the State produced sufficient evidence for the jury to find beyond a reasonable doubt that the defendant was the perpetrator of the sexual assault, supporting its verdicts of guilty of two counts of attempted forcible rape.

Defendant's first counseled assignment of error is without merit.[19]

The Louisiana Supreme Court subsequently denied relief without additional stated reasons.

The Louisiana Fourth Circuit properly analyzed the claim using the *Jackson v. Virginia* standard, which requires a determination whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Williams v. Cain*, 408 F. Appx. 817, 821 (5th Cir. 2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008). Review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. *United States v. Young*, 107 F. Appx. 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

A federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985). In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' " *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting

---

[19] *State v. Falgout*, 198 So.3d at 1240-43 (footnotes in original).

*Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis added)).

Here, the court of appeal concluded that the evidence was sufficient for the jury to find beyond a reasonable doubt that Falgout was guilty of two counts of attempted forcible rape.   Because a claim challenging the sufficiency of the evidence presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1); *Taylor v. Day*, Civ. Action No. 98–3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), *aff'd*, 213 F.3d 639 (5th Cir. 2000). Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."     *Parker v. Matthews*, 567 U.S. 37, 43 (2012); *see also Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

Falgout was charged with two counts of aggravated rape, but he was found guilty of two counts of attempted forcible rape.    In his federal petition, Falgout claims that the evidence was not sufficient to support his convictions for attempted forcible rape.    Falgout argues that the evidence did not suffice to prove his identity as the perpetrator because the victim never identified him.    Although he acknowledges that he was identified through his DNA found on the victim, he disputes that physical evidence because "only one speck of [his] DNA was found and it was from a swab of the victim's left buttocks [and] that speck of DNA was consistent with epithelial cells, which come from touching, and could have been

transferred to the victim's body from a piece of wood she was laying on during the attack."[20] He further suggests no rape occurred, "[b]ecause the tiny amount of Mr. Falgout's DNA was not from seminal fluid, and because it was not found on K.W.'s genitalia or anus, such does not constitute direct physical evidence of rape."[21]

K.W. provided consistent and detailed testimony at trial on both direct and cross-examination regarding the specific sexual acts that occurred.    She testified that she did not know her attacker and that the sex was not consensual.    She further testified that he had a pocket-knife and said, "If I don't panic he won't stab me."[22]    The victim's testimony satisfied the elements of attempted forcible oral and vaginal rape as set forth by the state court of appeal.[23]

The DNA match to Falgout more than sufficed to establish his identification as the perpetrator despite the fact that the victim could not recall enough details to help create a composite sketch of the perpetrator, and declined, because she was too upset, to identify the person who assaulted her, from a photographic lineup.    The DNA analysis provided a strong match to Falgout, "an estimated 411 billion times more likely that the sample contained DNA that was a mixture of DNA from K.W. and the defendant than from K.W. and an unrelated random individual from the Caucasian population," in the words of forensic

---

[20]  Rec. Doc. 1, p. 16.

[21]  Rec. Doc. 1, p. 21.

[22]  State Rec., Supp. Vol. 2 of 3, Trial Transcript (Oct. 21, 2014), p. 170.

[23]  State Rec., Supp. Vol. 2 of 3, Trial Transcript (Oct. 21, 2014), pp. 171-205.

DNA analysis expert, Elizabeth Hamilton.[24]    Hence, despite effectively advancing the defense theory during Ms. Hamilton's cross-examination testimony that Falgout's DNA was already on the piece of wood that K.W. touched and was simply transferred to the victim's buttock, that theory was obviously rejected by the jury, because even though Ms. Hamilton acknowledged it was possible to transfer DNA material in this fashion (secondary versus primary transfer), she opined it would be much less likely to develop a DNA profile from a secondary transfer.[25]    Furthermore, the fact that the samples were negative for seminal fluid was entirely consistent with K.W.'s descriptions of the encounter with the perpetrator and did not prove that she was not raped.    Considering K.W.'s detailed account as to how the attacks occurred and the sexual contact with unsuccessful penile penetration, the DNA results were reasonably sound, as the State presented on Ms. Hamilton's redirect examination at trial.    Even though no weapon was recovered, K.W. testified that the perpetrator had a knife and threatened to stab her during the assault.[26]    The jury was certainly entitled to credit K.W.'s testimony and reject the defense speculation as to how the transfer of DNA could otherwise have been accomplished.

When the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was irrational.    For these reasons, Falgout cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined

---

[24]  State Rec., Supp. Vol. 3 of 3, Trial Transcript (Oct. 21, 2014), p. 232.

[25]  State Rec., Supp. Vol. 3 of 3, Trial Transcript (Oct. 21, 2014), pp. 281-82.

[26]  State Rec., Supp. Vol. 2 of 3, Trial Testimony (Oct. 21, 2014), p. 180.

by the Supreme Court of the United States.

  B. *"Other-Crimes" Evidence (Claims 2, 5)*

      Falgout asserts that the trial court improperly admitted evidence at trial regarding

his prior forcible rape conviction.     The claim was considered and rejected by the state

courts on direct appeal.     In denying the claim, the Louisiana Fourth Circuit reasoned:

> By the second assignment of error, counsel contends that the trial court erred
> by allowing the State to introduce evidence of the defendant's prior forcible
> rape conviction. Counsel argues that the only purpose of this evidence was to
> show the defendant's bad character, and the probative value of its
> introduction was far outweighed by its prejudicial effect. Counsel asserts that
> the erroneous introduction of this evidence resulted in reversible error. Upon
> review, we find that the evidence was properly admitted at trial and we find
> no merit to this assignment of error.
>
> The State introduced evidence of the defendant's 1988 rape conviction
> pursuant to La. C.E. art. 412.2, which provides:
>
>> A. When an accused is charged with a crime involving sexually assaultive
>> behavior, or with acts that constitute a sex offense involving a victim who
>> was under the age of seventeen at the time of the offense, evidence of the
>> accused's commission of another crime, wrong, or act involving sexually
>> assaultive behavior or acts which indicate a lustful disposition toward
>> children may be admissible and may be considered for its bearing on any
>> matter to which it is relevant subject to the balancing test provided in
>> Article 403.
>>
>> B. In a case in which the state intends to offer evidence under the
>> provisions of this Article, the prosecution shall, upon request of the
>> accused, provide reasonable notice in advance of trial of the nature of
>> any such evidence it intends to introduce at trial for such purposes.
>>
>> C. This Article shall not be construed to limit the admission or
>> consideration of evidence under any other rule.
>
> The Louisiana Supreme Court has held that a defendant is not entitled to a full-
> blown pretrial *Prieur*[27] hearing before the trial court can find evidence
> admissible under La. C.E. art 412.2. *State v. Williams*, 2002–0989, 2002–1030

---

[27] *State v. Prieur*, 277 So.2d 126 (La. 1973).

(La. 10/15/02), 830 So.2d 984;[28] *see also State v. Woodberry*, 2014–0476, p. 14 (La. App. 4 Cir. 6/3/15), 171 So.3d 1082, 1091 ("Article 412.2 was enacted to loosen restrictions on 'other crimes' evidence, and to allow evidence of 'lustful disposition' in cases involving sexual offenses.").

La. C.E. art. 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In addition, pursuant to La. C.E. art. 403, a court may exclude relevant evidence if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." As noted by this Court in *State v. McElveen*, "[a] trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect." 2010–0172, p. 82 (La. App. 4 Cir. 9/28/11), 73 So.3d 1033, 1085, citing *State v. Lambert*, 98–0730, p. 22 (La. App. 4 Cir. 11/17/99), 749 So.2d 739, 755; *see also Woodberry*, 2014–0476, p. 14, 171 So.3d at 1091. Nonetheless, in *State v. George*, 2011–0325 (La. 2/23/11), 55 So.3d 788, the trial court ruled that the State could not introduce evidence because the court found that its relevance was equal to its prejudicial value. The Supreme Court reversed, noting:

> Article 403, though, does not allow for the exclusion of relevant evidence if its probative value is equal to its prejudice. Instead, the evidence of defendant's prior unadjudicated act of forcible rape should have been ruled inadmissible only if "its probative value is *substantially outweighed* by the danger of unfair prejudice." Therefore, the trial judge abused her discretion by barring introduction of defendant's prior unadjudicated juvenile act of attempted forcible rape. [emphasis supplied]

*Id.*, at p. 2, 55 So.3d at 789. Because the trial court did not find that prejudicial effect substantially outweighed its relevance, the Supreme Court found that the trial court abused its discretion by refusing to allow the State to introduce the evidence.

In the instant case, the State filed an art. 412.2 notice that indicated its intent to introduce evidence of the defendant's 1988 forcible rape conviction. In response, the defendant filed a motion *in limine* to exclude this evidence, mostly based on an argument that its probative value would be greatly outweighed by its prejudicial effect. At the April 15, 2014 hearing on these

---

[28]    Art. 412.2 was enacted in 2001 in response to the Court's ruling in *State v. Kennedy*, 2000–1554 (La.4/3/01), 803 So.2d 916, which held that evidence of other crimes was not admissible under La. C.E. art. 804 to show a lustful disposition toward minors. See, *State v. Layton*, 2014–1910, p. 4 (La.3/17/15), 168 So.3d 358, 360.

pleadings, the defense argued that this evidence should not be admitted because the defendant never admitted his guilt, and this evidence was unduly prejudicial. The trial court rejected this argument and ruled that this evidence would be admissible at trial.

The defendant now argues that the trial court erred in its ruling. He asserts that this evidence is not admissible under art. 412.2, because the "lustful disposition" language of that article is applicable only to child victims, and K.W. was not a child. However, in *State v. Wright*, 2011–0141 (La. 12/6/11), 79 So.3d 309, the Court specifically rejected the claim that art. 412.2 applies only to victims that are under the age of seventeen. Instead, the Court stated: "The statute specifically applies in two situations: 1) **when an accused is charged with a crime involving sexually assaultive behavior, or** 2) when an accused is charged with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense." *Id.*, p. 11, 79 So.3d at 316 (emphasis added).

The defendant appears to confuse the introduction of this evidence under La. C.E. art. 412.2 with a similar statute, La. C.E. art. 404 B, which provides for the introduction of evidence of other crimes in order to show a specified purpose, as described in *State v. Prieur*, 277 So.2d 126 (La. 1973) and its progeny. The State's notice, however, did not allege that it sought to introduce this evidence pursuant to art. 404 B; instead, it alleged that it was admissible under art. 412.2.

Lastly, the defendant argues that the evidence does not survive the balancing test of La. C.E. art. 403. In support, he argues that the evidence adduced at trial was insufficient to show that he was the perpetrator of the present offenses, and the jury's verdict was the result of V.H.'s identification of him in court as the man who raped her in 1988. However, the trial court found that the probative value of this evidence greatly outweighed its prejudicial effect. The defendant has not shown that the trial court abused its discretion in this finding. Indeed, as noted by this Court in *State v. Cox*, 2015–0124, pp. 11–12 (La. App. 4 Cir. 7/15/15), 174 So.3d 131, 138:

> All inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. *State v. Rose*, 06–0402, p. 13 (La. 2/22/07), 949 So.2d 1236, 1244 (citing *State v. Germain*, 433 So.2d 110, 118 (La. 1983)). The balancing test of La. C.E. art. 403 limits the introduction of probative evidence of prior misconduct "only when it is unduly and unfairly prejudicial." *Rose, supra. See also Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). The greater the degree of similarity of the offenses the more

the evidence enhances the probability that the same person was the perpetrator, and hence the greater the probative value of the evidence, which ultimately is to be weighed against its prejudicial effect. *Rose*, 06–0402, p. 14, 949 So.2d at 1244.

Moreover, this Court has found similar evidence to be admissible under La. C.E. art. 412.2. In *Woodberry*, this Court found that evidence of a prior sexual assault committed by the defendant was admissible at his trial under La. C.E. art. 412.2 where the circumstances of the prior instance, while not identical to the present ones, were similar in that they were all committed within a small area of the city, and they all involved the use of a gun to seize the victim and force her to a secluded spot, where the defendant raped the victims vaginally and anally. In *Cox*, this Court found evidence of sexual offenses with other juveniles in a different parish was admissible in the defendant's trial.[29]

Here, the circumstances of the 1988 rape of V.H. were similar to those in the present case. In both cases, the victims were on a deserted street after dark. In both cases, the perpetrator came up behind the victim, put a knife to her, and forced her into a nearby secluded area where he raped her. In the 1988 rape, the defendant demanded money and then sex; in the present case, the perpetrator, whose DNA profile matched that of the defendant, stole the victim's bus fare prior to fleeing. Given the cases cited above, the defendant has not shown that the trial court abused its great discretion by allowing the State to introduce at his present trial evidence of the 1988 rape for which he was convicted. This assignment of error is without merit.[30]

The Louisiana Supreme Court denied relief without additional stated reasons.[31]

---

[29] Also in *State v. Brown*, unpub. 2014–1110 (La. App. 4 Cir. 4/29/15), 2015 WL 2067283, the defendant was charged with indecent behavior with a juvenile, and this Court upheld the introduction of evidence that the defendant abused his sister-in-law and three of her friends when they were juveniles.

[30] *Falgout*, 198 So.3d at 1243-45 (footnotes in original).

[31] The State suggests in brief that the claim was procedurally defaulted because Falgout raised only a state-law "other crimes" evidence claim on direct appeal.    He did not raise the federal due-process issue until his state post-conviction relief proceedings, at which time it appears that the state courts declined to review the claim pursuant to Louisiana Code of Criminal Procedure article 930.4(A), because the "other crimes" evidence claim had already been reviewed on direct appeal.    The State cites no valid basis for any procedural default that would preclude this Court's review of the due-process issue under the scenario presented and has also presented an alternative merits argument in brief.    In fact, the State concedes that the bar imposed by the state courts pursuant to article 930.4(A) does not prevent review by this federal court of the claim raised on direct appeal.    Rec. Doc. 20, p.

A federal habeas court's review extends only to violations of constitutional magnitude such as due process violations that render the criminal proceedings fundamentally unfair.[32] *Lisenba v. California*, 314 U.S. 219, 236-37 (1941); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right.").    As the Fifth Circuit has explained, this high standard is not easily satisfied:

Due process is implicated only for rulings "of such a magnitude"[33] or "so

---

10 (citing *Bennett v. Whitley*, 41 F.3d 1581, 1583 (5th Cir. 1994)).    The State cites no precedent to support the contention that this Court is restricted to looking through to the direct appeal and only reviewing the claim in the context in which it was presented on appeal.    Rec. Doc. 20, p. 11.    The state courts cited no other specific procedural bar insofar as the failure to raise the due-process issue previously on direct appeal.    *See Simon v. Cain*, Civ. Action 13-0784, 2014 WL 6909671, at *3 n. 2 (W.D. La. Dec. 5, 2014).    To the extent that the due-process claim was not adjudicated on the merits, *de novo* review is proper. *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011).    Accordingly, the Court finds that the due-process claim is properly before this Court.

32    The State correctly notes that, to the extent Falgout argues that the trial court erred in misapplying state-law evidentiary rules to admit the evidence, that state-law claim is not cognizable on federal habeas review.    A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."    *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); *see also Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law); *accord Molo v. Johnson*, 207 F.3d 773, 776 n. 9 (5th Cir. 2000); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996)); *see also Hogue v. Johnson*, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).    Federal habeas review is limited to errors of constitutional dimension; thus, federal courts do not sit to review the mere admissibility of evidence under state law.    *Estelle*, 502 U.S. at 67-68; *Gonzales v. Thaler*, 643 F.3d at 429; *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).

33    *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976).

egregious"[34] that they "render the trial fundamentally unfair."[35]  It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts.[36]  Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."[37]

The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial."[38]  We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial[39] and the errors were not " 'so pronounced and persistent that it permeates the entire atmosphere of the trial.' "[40]  This is a

---

[34]  *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir. 1993).

[35]  *Id*. at 1227. A fundamentally unfair trial is one "largely robbed of dignity due a rational process." *Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir. 1984) (internal quotation marks omitted).

[36]  *See Guidroz v. Lynaugh*, 852 F.2d 832, 834–35 (5th Cir. 1988); *see also Luna v. Beto*, 395 F.2d 35, 40 (5th Cir. 1968) (en banc) (Brown, C.J., concurring specially) ("[F]or an otherwise valid state conviction to be upset years later on federal habeas, surely something more than an evidentiary mistake must be shown. If mistake is enough, then never, simply never, will the process of repeated, prolonged, postconviction review cease.").

[37]  *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (citing *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986)).

[38]  *Thomas v. Lynaugh*, 812 F.2d 225, 230–31 (5th Cir. 1987) (collecting cases); *accord Guidroz*, 852 F.2d at 834–35 (quoting *Donnelly*, 416 U.S. at 639, 94 S.Ct. 1868).

[39]  *See*, *e.g.*, *Cupit v. Whitley*, 28 F.3d 532, 537 (5th Cir. 1994) (hearsay evidence was not significant to the verdict because the defendant's "own statements given to law enforcement officers.... in conjunction with [his] actions, constituted the most devastating evidence against him"); *Pemberton*, 991 F.2d at 1227 ("In the face of a confession, the most probative and damaging evidence that can be admitted against a defendant, Pemberton's threats to the life of the victim, and other circumstantial evidence, the hearsay testimony elicited at trial was not crucial." (internal citation omitted)); *Corpus v. Estelle*, 571 F.2d 1378, 1381 (5th Cir. 1978) (admission of other-crimes evidence to prove identity in rape trial did not render the trial fundamentally unfair "because of the convincing testimony given by the victim herself"). Cf. *Snowden v. Singletary*, 135 F.3d 732, 737–39 (11th Cir. 1998) (where "the heart of the case" was testimony by three allegedly abused children, due process was violated by improper expert opinion that 99.5% of children tell the truth about sexual abuse).

[40]  *Gordon v. Johnson*, 189 F.3d 468, 1999 WL 548588, at *2 (5th Cir. 1999) (unpublished) (quoting *United States v. Stewart*, 879 F.2d 1268, 1271 (5th Cir. 1989)). Cf.

high hurdle, even without AEDPA's added level of deference.

*Gonzales*, 643 F.3d at 430-31 (footnotes in original).    Falgout has made no such showing in this case.

Falgout argues that the erroneous admission denied him a fair trial because the victim in that prior rape case was able to testify at trial and had identified him as her assailant, whereas K.W. never made any identification of Falgout as her attacker.    He claims that the jury must have improperly relied on that identification and been "lured into declaring guilt" based on this "other crimes" evidence.    His assertion is based upon his belief that "there was no direct evidence that he raped or attempted to rape K.W., only a speck of his DNA found on a swab of K.W.'s left buttocks that could have been transferred to her body from a piece of wood."[41]

As previously addressed, Falgout's defense theory surrounding the DNA was highly implausible based on the evidence presented by the State.    The DNA match to Falgout in this case was the compelling proof of his identity as the perpetrator in K.W.'s rape, rather than the fact that a different rape victim had identified him as her attacker in a 1988 rape case.    Given the DNA match to Falgout in this case, which provided strong direct evidence

---

*Maurer v. Dep't of Corrs.*, 32 F.3d 1286, 1288–91 (8th Cir. 1994) (due process violated when prosecutor bolstered rape victim's testimony by asking four other witnesses whether she seemed sincere); *Cooper v. Sowders*, 837 F.2d 284, 286–88 (6th Cir. 1988) (due process violated by cumulative effect of trial judge's incorrectly stating that police officer was an expert witness, allowing the officer to give opinion on defendant's guilt, and allowing police informant to bolster credibility by discussing his testimony in past cases); *Menzies*, 743 F.2d at 288–289 (due process violated where numerous errors and prosecutorial misconduct "crippled the ability of Petitioner's lawyer to present an effective defense on his behalf"); *Walker v. Engle*, 703 F.2d 959, 963–69 (6th Cir. 1983) (due process violated by cumulative effect of six separate errors allowing admission of irrelevant and inflammatory evidence).

[41]  Rec. Doc. 1, p. 26.

as to the perpetrator's identity, the jury plainly did not infer from the prior rape victim's account of a similar rape by Falgout in 1988, for which he was convicted, that he must have also raped K.W. in 2013.    The direct examination of V.H. was extremely brief and recounted similar details of a rape admittedly committed by Falgout in 1988.    She did not identify Falgout in court; she testified only that Falgout went to trial and was convicted in the 1988 case.[42]    Her testimony was relevant in providing background to explain how the sample taken in this case matched Falgout, whose DNA was previously collected in connection with the 1988 rape for which he was convicted, and provided the hit in the national database, the Combined DNA Index System (CODIS), as Detective Reuben Henry testified at trial when relating details surrounding the investigation and apprehension of Falgout.[43] Furthermore, the record shows that the trial court specifically instructed jurors on the restricted use of "other crimes" evidence.[44]    There is nothing in this case, apart from Falgout's unsupported allegations, to suggest that even if wrongfully admitted, contrary to the state courts' explicit findings otherwise, the statements made by the victim in the 1988 rape case played a critical or highly significant role in the jury's guilty verdict and rendered his trial fundamentally unfair.    This claim does not warrant habeas relief.

  *C. Ineffective Assistance of Counsel (Claims 3, 4, 4a, 6)*

        Finally, Falgout alleges that trial counsel failed to file a written objection to the multiple-offender bill of information or subject the case to meaningful adversarial testing by

---

[42]  State Rec., Supp. Vol. 2 of 3 (Trial Transcript, Oct. 21, 2014), pp. 51-57.

[43]  State Rec., Supplemental Vol. 2 of 3, Trial Transcript (Oct. 21, 2014), pp. 75-79.

[44]  State Rec., Supplemental Vol. 3 of 3, Trial Transcript (Oct. 22, 2014), p. 80.

conducting adequate investigation and presenting an expert witness in DNA analysis.    He alleges that appellate counsel failed to assert the claims of ineffective assistance of trial counsel on direct appeal.    Falgout, in a *pro se* brief, raised the first claim related to his multiple-offender proceedings on direct appeal and the remaining claims on collateral review.    In denying the claim on direct appeal, the Louisiana Fourth Circuit reasoned:

> By his sole *pro se* assignment, the defendant contends that his counsel was ineffective for failing to file a written objection to the multiple bill as required by La. R.S. 15:529.1 D(1). He asserts that by failing to do so, counsel was estopped from raising an objection as to the voluntariness of one of his predicate offenses. This assignment is without merit.
>
> In addressing a claim of ineffective assistance of counsel, a reviewing court must determine if the defendant met the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under this test, a defendant must show both that his counsel's performance was deficient and that this deficiency prejudiced him. See *State v. Small*, 2013–1334, p. 14 (La. App. 4 Cir. 8/27/14), 147 So.3d 1274, 1284; *State v. Turner*, 2013–0285, p. 2 (La. App. 4 Cir. 12/4/13), 131 So.3d 106, 108; *State v. Williams*, 2006–1327, p. 30 (La. App. 4 Cir. 1/23/08), 977 So.2d 160, 177. A defendant must show that counsel made errors so serious that counsel "was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Turner*, 2013–0285, pp. 2–3, 131 So.3d at 108; see also *State v. West*, 2009–2810 (La. 12/10/10), 50 So.3d 148. In order to show prejudice, the defendant must prove that the errors were so serious that he was deprived of a fair trial. "To carry his burden, the defendant 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Turner*, 2013–0285, p. 3, 131 So.3d at 108, quoting *Strickland*, 466 U.S at 693, 104 S.Ct. at 2068. Moreover, as noted by this court in *State v. Barnes*, 2012–1283 pp. 18–19 (La. App. 4 Cir. 10/2/13), 126 So.3d 606, 617:
>
>> "Hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." *State v. Brooks*, 505 So.2d 714, 724 (La. 1987). If trial counsel's actions fall "within the ambit of trial strategy," they do not establish "ineffective assistance of counsel." *State v. Bienemy*, 483 So.2d 1105, 1107 (La. App. 4th Cir. 1986).
>
> See also *Jones v. Cain*, 2014–0226 (La. App. 4 Cir. 10/8/14), 151 So.3d 781.

Here, there is no indication that counsel filed a written objection to the multiple bill as contemplated by La. R.S. 15:529.1. Nonetheless, the transcript of the April 16, 2015 multiple bill hearing shows that the trial court allowed counsel to argue the issue of the voluntariness of one of the predicate offenses listed in the multiple bill. Counsel attempted to cross-examine the fingerprint expert about what was contained in the waiver form for that prior offense, but the trial court sustained the State's objection to these questions because the expert's testimony pertained only to the fingerprints and to the identification of the defendant. During argument on the multiple bill, counsel asserted that because the defendant had not checked on the waiver form that he wanted a jury or a judge trial, the defendant must not have been advised of this right.

The trial court correctly rejected this argument. Indeed, the multiple bill exhibits are in the appeal record, including the plea form to which counsel referred in his argument. The form advised the defendant that by pleading guilty, he waived, among other things, his right "[t]o a trial by either a judge or a jury and that further the right to a trial by judge extends until the first witness is sworn, and the right to a trial by a jury extends until the first juror is sworn, and if convicted the right to an appeal. Please specify: Judge trial or Jury Trial." The defendant placed his initials next to this waiver, as well as next to the other rights he was waiving. At the bottom of the form, there is a note that states: "Defendant is to place his initials in the blocks provided for same. Defendant is to block out Judge Trial or Jury Trial as he applies [sic]." Defense counsel pointed to the defendant's failure to block out either judge trial or jury trial on the form to support his theory that the defendant was not advised of his right to a trial by judge or jury. However, the defendant initialed next to the advisement that he had a right to a trial by judge or jury; the "note" is listed at the bottom of the form, below the signature lines for the judge, the defendant, and his counsel. The defendant makes no argument that he was not advised of this right, and indeed the form that he initialed and signed so advised him. Therefore, even if counsel had filed a written objection to the multiple bill, this claim would have had no merit. Because the defendant cannot show any prejudice from counsel's failure to file a written objection to the multiple bill, he cannot show that counsel was ineffective.[45]

The Louisiana Supreme Court denied relief without additional stated reasons.    Similarly, on collateral review, the state courts denied his claims of ineffective assistance with respect to both trial and appellate counsel, finding that he failed to show ineffective assistance of

---

[45] *State v. Falgout*, 198 So.3d at 1245-47 (footnotes omitted).

counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).

In order to prove ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."

*Id.*

Because the claims were adjudicated on the merits in state court, habeas relief is available only if that adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86 (2011). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted).

Falgout contends that if defense counsel had objected in writing to the multiple bill, he could have established during the multiple-bill hearing that prior guilty pleas were taken without adequate advice of his right to waive a trial by jury or judge. Falgout maintains that because no written objection had been lodged, the trial court sustained the State's relevancy objection to the defense's line of questioning of the fingerprint expert witness, Officer Jackson, and thus effectively prohibited the defense from asserting an objection to the voluntariness of an underlying predicate offense.

To establish habitual-offender status under Louisiana Revised Statute 15:529.1, the State is required to prove the existence of a prior felony conviction and that the defendant is the same person who was convicted of the prior felony. *State v. Staggers*, 03-655 (La. App. 5 Cir. 2003), 860 So.2d 174, 180 (citing *State v. Davis*, 02-387 (La. App. 5 Cir. 9/30/02), 829 So.2d 554. Certified copies of court records evidencing prior convictions are sufficient to prove the prior conviction. *Id.* However, independent proof, such as matching fingerprints and other vital information, is required to show that the defendant is the same person identified in those records. *Id.* (citing *State v. Walker*, 01-348 (La. App. 5 Cir. 8/28/01), 795 So.2d 459, 463).

The record in this case reflects that defense counsel reviewed the multiple bill filed by the State and required the State to prove the necessary elements for the multiple bill. During the multiple-offender adjudication, defense counsel thoroughly cross-examined the State's expert fingerprint witness, Officer Jackson. The objection to relevancy was sustained when counsel attempted to question him about what was contained in a waiver form on a predicate conviction, because he was only a fingerprint expert. However, at the end of the proceedings, the trial court allowed defense counsel to state his objection to the predicate guilty-plea conviction, which was unsuccessful. Falgout has not identified any other proper defenses that should or could have been raised as to the multiple-offender bill during the hearing to support his claim that counsel was constitutionally ineffective. As the court of appeal observed, the multiple-bill exhibits associated with the guilty plea at issue confirmed that Falgout was both advised of and waived his right to a trial by either judge or jury. Even if no objection had been raised, counsel does not perform deficiently in failing to lodge a meritless objection. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (counsel is not required to make futile motions or objections); *see also Smith v. Puckett*, 907 F.2d 581, 585 n. 6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."). However, here, defense counsel objected during the hearing on these grounds despite not having previously filed a written objection, and the trial court considered, but overruled, the objection. [46] Falgout sustained no prejudice by counsel's failure to lodge a written objection on these grounds to the multiple bill. This claim lacks merit.

---

[46] State Rec., Supp. Vol. 1 of 3, Sentencing Transcript, pp. 21-25.

Next, Falgout argues generally that trial counsel's inadequate preparation for trial, including his failure to investigate, present a defense and call an expert witness, amounts to a denial of counsel under *Cronic* such that prejudice is to be presumed.    *United States v. Cronic*, 466 U.S. 648, 659–60 (1984).    Pursuant to *Cronic*, the performance of counsel may be so inadequate as to constitute no assistance of counsel at all, despite the physical presence of an attorney at the proceeding.    *Cronic*, 466 U.S. at 654 n. 11.    The *Cronic* presumption of prejudice arises in circumstances where: (1) there exists a "complete denial of counsel" or a denial of counsel "at a critical stage" of defendant's trial; (2) defense counsel fails to "subject the prosecution's case to meaningful adversarial testing;" or (3) counsel "is called upon to render assistance where competent counsel very likely could not."    *Cronic*, 466 U.S. at 658-59 (citations omitted).    Only in these "circumstances of magnitude" may "the likelihood that the verdict is unreliable [be] so high" that a constitutional violation may be found. *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).    "It is not enough for the defendant to show mere 'shoddy representation' or to prove the existence of 'errors, omissions, or strategic blunders' by counsel.    Bad lawyering, regardless of how bad, does not support the [per se] presumption of prejudice."    *Johnson v. Cockrell*, 301 F.3d 234, 238-39 (5th Cir. 2002) (citing *Jackson v. Johnson*, 150 F.3d 520, 525 (5th Cir. 1998) (quoting *Childress*, 103 F.3d at 1228-29).

Falgout offers only an unsupported allegation that counsel "failed to hold the State to the adversarial process," presumably because he did not call an expert witness to testify about the transfer of DNA.    The record shows that defense counsel simply chose to rely on extensive cross-examination of Ms. Hamilton at trial, for which counsel was well-prepared, to establish the possibility of a secondary transfer scenario and place doubt in the jury's mind

to support the defense theory.[47]    Plainly, Falgout has not demonstrated that the *Cronic* presumption of prejudice applies here.

Moreover, the state-court record contradicts Falgout's assertion that counsel failed to subject his case to meaningful adversarial testing at each stage of the proceedings.    Falgout must do more than present conclusory assertions to establish ineffective assistance of counsel.    *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").    Furthermore, with respect to an attorney's duty to investigate, the controlling law provides:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Newbury v. Stephens*, 756 F.3d 850, 873 (5th Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. at 690-91).    Contrary to Falgout's conclusory allegations, the record in this case shows that counsel adequately investigated the case, conducted sufficient discovery, argued numerous pretrial motions, and was fully prepared for trial as shown by his thorough cross-examination of the prosecution witnesses.    The defense theory that Falgout's DNA was erroneously linked to this rape through secondary transfer at the site was advanced through extensive cross-examination of the State's expert in the field of forensic DNA analysis.

---

[47]    State Rec., Supp. Vol. 3 of 3, Trial Transcript (Oct. 21, 2014), pp. 234-77.

Counsel's decision in that regard was a strategic decision entitled to a strong presumption of reasonableness.    *Richter*, 562 U.S. at 104.

Falgout has not identified an expert witness on behalf of the defense who would have been willing to testify to anything significantly different, or more importantly, beneficial to the defense's case, than the information elicited at trial from the available expert witness. To prevail on such a claim, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.    *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008)).    The Fifth Circuit has "clarified that the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.' "    *Hooks v. Thaler*, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting *Woodfox*, 609 F.3d at 808).    Falgout offers nothing in this regard to support his otherwise self-serving and entirely speculative allegations.    *See*, *e.g.*, *Anthony v. Cain*, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("Petitioner has furnished neither the state courts nor this Court any evidence to show that an expert would have disputed Dr. Benton's conclusions. Petitioner has, therefore, failed to establish that counsel was ineffective in failing to call such an expert witness.").    On the record presented, Falgout has not shown that the state-court denial of relief on these claims under *Strickland* was contrary to or an unreasonable application of United States Supreme Court precedent.

Finally, Falgout argues that appellate counsel should have raised trial counsel's ineffectiveness in failing to obtain an expert DNA witness for trial as an assignment of error on direct appeal.    The *Strickland* standard for judging performance of counsel also applies

37

to claims of ineffective appellate counsel.    *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).    To prevail on a claim that appellate counsel was constitutionally ineffective, a petitioner must show that his appellate counsel unreasonably failed to discover and assert a nonfrivolous issue and establish a reasonable probability that he would have prevailed on this issue on appeal but for his counsel's deficient representation.    *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001); *Smith*, 528 U.S. at 285-86, 120 S.Ct. 746.    For the reasons previously explained, there is no support for the underlying conclusory claim.    There has been nothing offered to show that some unidentified, hypothetical expert in forensic DNA analysis would have contradicted the expert forensic analyst at trial or offered anything different or beneficial to the defense's case, such that counsel would have been deficient in failing to produce an independent expert witness at trial.    Nor was it even proper, arguably, for appellate counsel to assert such a claim on direct appeal regarding trial counsel's purported ineffectiveness since these issues are most often relegated to post-conviction proceedings rather than addressed on appeal.    Falgout chose to raise only one claim of ineffective assistance of counsel in a *pro se* capacity on direct appeal.    In any event, because any appellate claims challenging the failure to call an expert witness would have been meritless, appellate counsel cannot be deemed ineffective for failing assert such claims.

In summary, Falgout has not shown that the state-court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.    Accordingly, under the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Falgout's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[48]

New Orleans, Louisiana, this __30th__ day of _____September_____ 2021.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[48]    *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.